IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>GEORGE PICKARD, )<br>)<br>)<br>Defendant. ) | Criminal No. 2:22-CR-87 |

**<u>GOVERNMENT'S POSITION ON SENTENCING</u>**

The United States of America now submits its position on sentencing. In the Presentence Investigation Report (PSR), the U.S. Probation Office determined that the advisory guidelines sentencing range is a term of 46–57 months' imprisonment on Count One of the Indictment, possession of unregistered firearms, in violation of 26 U.S.C. §§ 5841, 5845, 5861(d), and 5871, and 18 U.S.C. § 921(a)(24). For the reasons below, the Court should impose a sentence within the guidelines range, which would be sufficient, but not greater than necessary, to accomplish the goals of 18 U.S.C. § 3553(a).

The defendant's guidelines range stems from the following calculations. His base offense level is 20 because the offense involved a "semiautomatic firearm capable of accepting a large-capacity magazine and the defendant was a prohibited person at the time of the offense"—he was an unlawful user of controlled substances. PSR ¶ 15; U.S.S.G. § 2K2.1(a)(4)(B). He received a two-point enhancement because the "offense involved 3 to 7 firearms," specifically six firearms. PSR ¶ 16; U.S.S.G. § 2K2.1(b)(1)(A). He received a four-point enhancement because he "used or possessed any firearm or ammunition in connection with another felony offense"—felony "possession of LSD." PSR ¶ 17; U.S.S.G. § 2K2.1(b)(6)(B). Finally, he received a three-point

reduction for acceptance of responsibility, for a Total Offense Level of 21. His Criminal History Category is I since he has no prior convictions. PSR ¶ 28.

## II.  MOTION FOR ACCEPTANCE OF RESPONSIBILITY

Under U.S.S.G. § 3E1.1(b) and based on the terms of the plea agreement, the United States moves the Court to grant an additional one-level reduction in the defendant's offense level for acceptance of responsibility. The defendant timely notified the United States of his intention to enter a plea of guilty, thereby allowing the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently.

## III.  BACKGROUND

On June 23, 2022, a federal grand jury sitting in Norfolk returned a three-count indictment charging the defendant with possession of unregistered firearms, in violation of 26 U.S.C. §§ 5841, 5845, 5861(d), and 5871, as well as 18 U.S.C. § 921(a)(24) (Count One); possession of a controlled substance, in violation of 21 U.S.C. § 844(a) (Count Two); and making a false statement, in violation of 18 U.S.C. § 1001(a) (Count Three). ECF No. 1.

On September 20, 2022, the defendant pleaded guilty under a plea agreement. ECF Nos. 17, 19. U.S. Magistrate Judge Lawrence Leonard accepted the plea, and the Court scheduled sentencing to take place on January 26, 2023.

## IV.  STANDARDS GOVERNING SENTENCING

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court made clear that sentencing courts should consult [the Sentencing] Guidelines and take them into account when sentencing." 543 U.S. at 264. The Supreme Court provided this direction to promote the sentencing goals of Congress, namely to "provide certainty and fairness in meeting the purposes of sentencing,

[while] avoiding unwarranted sentencing disparities." *Booker*, 543 U.S. at 264 (quoting 28 U.S.C. § 991(b) (1) (B)). In *Molina-Martinez v. United States*, the Court emphasized the role the Guidelines play in achieving "[u]niformity and proportionality in sentencing," and noted that "the Guidelines are not only the starting point for most federal sentencing proceedings but also the lodestar." 136 S. Ct. 1338, 1346 (2016).

> The Fourth Circuit has provided the following guidance in the wake of *Booker*:
>
> A district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Thus, sentencing courts must consider the factors outlined in 18 U.S.C. § 3553(a), including the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) and (B).

"[I]n imposing a sentence after *Booker*, the district court must engage in a multi-step process. First, the court must correctly determine, after making appropriate findings of fact, the applicable guideline range." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006). "Next, the court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'" *Id.* (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)). In making this determination,

> a sentencing court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and the need "to reflect the seriousness of the offense," provide "just punishment," "afford adequate deterrence," "protect the public,"

3

> and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

*United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006) (quoting 18 U.S.C. § 3553(a)).

Under 18 U.S.C. § 3553(a), when imposing a sentence that is sufficient but not greater than necessary, the Court shall consider: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to promote the goals of sentencing; (4) the kinds of sentences available; (5) the sentencing guideline range; (6) any pertinent policy statement issued by the Sentencing Commission; (7) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (8) the need to provide restitution to any victims of the offense.

## V. ARGUMENT

### A. Nature and Circumstances of the Offense.

The nature and circumstances of the offense are serious and justify a sentence within the guidelines range. The defendant, an unlawful user of controlled substances, built homemade silencers, but did not register them with the National Firearms Registration and Transfer Record. He also kept at least four firearms at his residence, including an AR-15-style rifle, and he equipped the silencers to two of the firearms. He loaded two firearms with large-capacity magazines. And he kept LSD in the same residence as his firearms. He did all this while maintaining dangerous ties to far-right extremist organizations, even bringing the AR-15-style rifle and suppressor to a militia camp and making online threats against Jewish people and minorities.

The defendant first came to the FBI's attention in November 2019 when a tipster reported that the defendant was posting messages on Facebook and other "social media platforms" "about using violence against … Jewish and minority groups." SOF ¶ 1.

4

The FBI's concerns about the defendant escalated when a confidential informant revealed that, in February 2020, the informant and the defendant had "attended a camping event" with "members of a militia group." SOF ¶ 2. The defendant "brought to the event an AR-15 style rifle to which he had affixed a homemade, unregistered suppressor created using an oil can and a threaded adaptor device." *Id.* Explaining why he did comply with the law requiring him to register the suppressor "in the National Firearms Registration and Transfer Record," he said that "free men don't need tax stamps." *Id.* He "was photographed and videotaped holding and shooting the firearm with the attached suppressor." *Id.*

After the event, the defendant and informant further discussed the defendant's unregistered suppressor via text message. He advised the informant on how to "create his/her own homemade suppressor," but also warned the informant "that homemade suppressors were 'not legally usable as a silencer without a form 1'" and that the informant should "not take a suppressor device 'to the range or show it off.'" SOF ¶ 3. Further, eBay records "confirmed that the defendant previously had purchased threaded oil filter adaptor devices from the website." SOF ¶ 4. These devices are used to create suppressors.

On December 29, 2020, FBI agents executed a search warrant at the residence the defendant shared with his parents "when he was not traveling for his job as a merchant seaman." SOF ¶ 5. The agents recovered:

- An AR-15 style rifle "loaded with a 30-round magazine," SOF ¶ 6;
- A Smith and Wesson M&P 9mm handgun, *id.*;
- An Inter Arms pistol, PSR ¶ 7;
- A Black Aces tactical shotgun, *id.*;

- Two cylindrical devices without serial markings later confirmed to be silencers, SOF ¶¶ 6–7;

- "[A]n oil can similar to that shown in the photographs of the defendant shooting a firearm with a homemade suppressor," but was not classified as a suppressor, *id.*;

- Threading devices, SOF ¶ 6; and

- A quantity of suspected LSD, which later lab-tested positive for the substance, SOF ¶¶ 6, 10.

One of the recovered handguns was similarly "loaded with a magazine capable of accepting more than 20 rounds." PSR ¶ 7. The defendant's preference for these kinds of magazines is particularly concerning. As the en banc Fourth Circuit observed, "large-capacity magazines enable shooters to inflict mass casualties while depriving victims and law enforcement officers of opportunities to escape or overwhelm the shooters while they reload their weapons." *Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017) (en banc), *abrogated on other grounds by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). And "[e]ven in the hands of law-abiding citizens, large-capacity magazines are particularly dangerous" because, "when inadequately trained civilians fire weapons equipped with large-capacity magazines, they tend to fire more rounds than necessary and thus endanger more bystanders." *Id.*

The agents later "confirmed that the defendant had no silencers registered to him" in the National Firearm Registration and Transfer Record. SOF ¶ 8. And "a photograph from the defendant's phone showed him with a handgun to which one of the suppressors had been affixed." SOF ¶ 9.

Around the time of the search, the defendant participated in a voluntary interview with the agents at his residence. He admitted attending the camping event and "shooting a rifle with a homemade suppressor attached to it." SOF ¶ 11. He also admitted that he had paid his brother to

6

straw-purchase the Smith & Wesson handgun for him because, at the time, he "was less than 21 years old and so was unable legally to purchase the handgun for himself." SOF ¶ 12.

The defendant's brother committed at least three felonies for the defendant when straw-purchasing the firearm for him—one by joining the straw-purchasing conspiracy and two by lying on the federal gun-purchasing form. The defendant did not hesitate to subject his own brother to significant criminal exposure when he told the brother to complete the form, buy the gun, and transfer it to him. Before the defendant entered into his plea agreement, his brother faced the possibility of federal charges, federal felony convictions, time in prison, and time on federal supervised release.[1] And such a conviction triggers the loss of important rights—the right to vote, the right to hold public office, and the right to possess firearms. The defendant did not seem to care about what happened to his brother, what happened to the brother's clean record, or what happened to the brother's job prospects if they were caught. Whatever it takes to obtain an extra gun, apparently.

In the same interview, the defendant "claimed that he had already sent in an ATF Form 1, in November 2020." *Id.* An ATF agent checked the National Firearm Registration and Transfer Record to determine whether there was a pending form submitted by the defendant and confirmed there was not. Instead, months after the interview, the defendant completed and submitted a Form 1. *See* Gov. Exh. 1, ATF Records. The defendant's self-serving statement thus served as the basis for the false-statement count charged against him in Count Three. And when completing the form, the defendant notably checked the box indicating that he was not an unlawful user of controlled substances, *id.* at 4, which was untrue.

---

[1] As part of the plea agreement, the government agrees not to prosecute the defendant's brother for any offenses relating to the straw-purchased firearm.

In later interviews, the defendant admitted to purchasing and using "psilocybin and LSD." PSR ¶ 9. He added that he had previously either been associated with or a member of the following "right leaning politically motivated groups":

- **Identity Evropa**: "[O]ne of the largest groups within the alt right segment of the white supremacist movement" that participated in "the Unite the Right white supremacist rally in Charlottesville." *American Identity Movement (AIM)*, Anti-Defamation League, https://www.adl.org/resources/hate-symbol/american-identity-movement-aim (last visited Jan. 12, 2023).

- **American Identity Movement**: In March 2019, Identity Revropa rebranded as this organization, "an alt right white supremacist group" that "was disbanded in November 2020." *Id.*

- **The Right Stuff**: A neo-Nazi organization and blog "known for promoting white supremacy while popularizing the 'echo' method of marking Jewish people online." Brian Lisi, *Neo-Nazi Blog Struggles After Founder's Wife is Revealed to Be Jewish*, N.Y. Daily News (Jan. 17, 2017, 11:58 a.m.), https://www.nydailynews.com/news/national/neo-nazi-blog-struggles-founder-wife-identified-jewish-article-1.2948308.

- **Patriot Front**: A white supremacist group that "requires members to deface racial justice murals and monuments to Black Lives Matter in their communities, much like a street gang that requires initiates to 'tag' buildings as a form of vandalism and intimidation." Sergio Olmos, *'We Are Desperate for New People': Inside a Hate Group's Leaked Online Chats*, The Guardian (Jan. 28, 2022, 2p.m.), https://www.theguardian.com/world/2022/jan/28/leaked-online-chats-white-nationalist-patriot-front.

The defendant further indicated that "he had recently become a member of the Asatru Folk Assembly," which he described as "a church." PSR ¶ 9. But it's really a wolf in sheep's clothing —"a white's only religious organization" that expresses its "bigotry in baseless claims of bloodlines grounding the superiority of one's white identity." Celine Castronuovo, *More than 120,000 Signatures Collected to Stop 'Whites Only' Church in Minnesota Town*, The Hill (Dec. 23, 2020, 11:00 a.m.), https://thehill.com/homenews/state-watch/531431-more-than-120000-signatures-collected-to-stop-whites-only-church-in/.

What's more, the defendant cohosts a podcast called "White Phosphorus" that depicts "women, African Americans, Jews, and other current events in a negative and derogatory manner." PSR ¶ 9.

The nature, circumstances, and seriousness of the defendant's crimes, particularly against the backdrop of hateful rhetoric and threats, strongly show that the defendant warrants a within-guidelines sentence.

    B.    **History and Characteristics of Defendant.**

The defendant's history and characteristics also support a guidelines sentence. His personal and family history, as well as his lack of criminal history, may be somewhat mitigating, but, as discussed above, his embrace of extremist hate groups and his threats against Jewish people and minority groups are troubling enough, when considered with the other factors, to justify this recommendation.

The defendant, 23, was born and raised in Hampton Roads by his father, an engineer, and his mother, a homemaker, in a "pleasant and suburban area." PSR ¶ 33. "[H]e was always provided with the basic necessities." *Id.* He graduated high school early, although "he was sent to the maritime academy at 15 years old because he broke into his high school." PSR ¶ 50. He started college at 16 and graduated with a Bachelor of Science in marine transportation in 2018. Since then, he has been employed as a Marine Merchant Officer for the Armed Forces, ultimately achieving a rank of second officer. PSR ¶¶ 55, 58.

The defendant is in good physical health. PSR ¶ 41. As to his mental health, he admitted to the probation officer that he had "attempted to avoid receiving certain diagnosis, so he could maintain his security clearance." PSR ¶ 43. For example, "he was diagnosed with bipolar disorder

9

at 17 years old." PSR ¶ 42. That diagnosis "interfered with his security clearance, so he sought to have [it] overturned." PSR ¶ 43. He now claims that his doctor "switched his diagnosis to Asperger Syndrome," allowing him to keep his security clearance. *Id.* He "reported a history of taking a large dose of Adderall … during the school week while in college," which resulted in his bipolar disorder diagnosis. PSR ¶ 44. He stopped the medication after being diagnosed with Asperger's, which undermined his recent claim at Western Tidewater Regional Jail that he "desperately need[ed] [his] medication" and that he "won't last another month" without it. PSR ¶ 45. Indeed, staff told him that "he had not taken mental health medication for approximately 1 year prior to his incarceration." *Id.*

To be sure, the defendant's "history of present illness" suggests that he struggles relating to or socializing with others, but that certainly is no excuse for the way he has viewed and threatened people different than him.

The defendant's claim that he used mushrooms and LSD one time each when he was 20, PSR ¶ 46, is inconsistent with his multiple admissions to FBI agents about his drug use and the recovery of LSD during the December 2020 search of his residence. The defendant additionally reported that "he experimented with psychedelics to treat his mental health," which further supports the conclusion that the defendant unlawfully used controlled substances. PSR ¶ 46.

      **C.**    **Other Factors to be Considered under 18 U.S.C. § 3553(a)**

The need to reflect the seriousness of the offense, the need to promote respect for the law, the need to provide just punishment, the need to deter this defendant and to deter future defendants, and the need to protect the public all support the recommended sentence.

The Eighth Circuit demonstrated how these factors apply to facts similar to those here. After learning that the school he donated money to was run by Jesuits, Daniel Richardson became upset and uploaded YouTube videos of himself threatening "anyone who wanted to be a Jesuit." *United States v. Richardson*, 824 F. App'x 432, 433 (8th Cir. 2020) (per curiam). He later drove to the school in his truck, which he had packed with "a machete, a handgun, and a 5-foot-long Samurai sword." *Id.* An officer arrived and arrested him, recovering those weapons, and a later search of his trailer "revealed that he also had two other handguns with unregistered silencers." *Id.*

Richardson was charged with several crimes, but pleaded guilty to possessing unregistered silencers. *Id.* His offense level was lower than the defendant's—15. *See* Gov. Resp. Br. at 4, *United States v. Richardson*, 2019 WL6135357, at *4 (8th Cir. Nov. 12, 2019). And like the defendant, Richardson had no prior convictions, so his Criminal History Category was I. *Id.* at *17. Richardson's total offense level was thus 18–24 months in prison.

The Eighth Circuit affirmed the district court's decision to vary upward and sentence Richardson to 60 months in prison. In doing so, the court observed that the district court correctly "connected Richardson's statements to his *conduct*," including "the large number of weapons he had." *Richardson*, 824 F. App'x at 434 (emphasis in original).

Relevant here, the connection between the defendant's threats and his possession of firearms is in some ways more severe and in other ways less severe than Richardson's criminal conduct. The defendant did not drive to a school with weapons, as Richardson did. That fact suggests that the defendant should receive a sentence slightly less than Richardson's.

Richardson's threats were unclear, however, requiring his victims to see him with the weapons to understand that he intended to carry out those threats. Here, on the other hand, the

11

defendant admits that he made "threatening posts" and traveled to a militia camp armed with an AR-15-style rifle equipped with a suppressor. SOF ¶¶ 1–2. He also had deadlier weapons than Richardson—his AR rifle loaded with a 30-round magazine, shotgun, and two handguns, one of which was loaded with another large-capacity magazine, vs. Richardson's machete, samurai sword, and three pistols. Together with his dangerous drug use, these facts show that the defendant was fully capable of taking similar, if not worse, actions as compared to Richardson.

The dangerous connection between the defendant's threats and derogatory comments toward Jewish and minority groups and his firearm and suppressor possession is consistent with the culture of extremist groups like the ones he's affiliated with—violence is the central tool for their message. A guidelines sentence will go a long way in counteracting that culture of hate.

Such sentence will likewise deter the defendant and others with similar views from unlawfully obtaining and possessing firearms and suppressors, will reflect the seriousness of the defendant's offense, and will protect the public.

## VI.   CONCLUSION

Based on the above facts and all the factors set forth in 18 U.S.C. § 3553(a), the recommended sentence is sufficient but not greater than necessary.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____/s/_____
William B. Jackson
Assistant United States Attorney
United States Attorney's Office
World Trade Center, Suite 8000
101 W. Main Street
Norfolk, Virginia 23510
Office Number: (757) 441-6331
Facsimile Number: (757) 441-6689
william.jackson3@usdoj.gov

13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of January, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Eric Leckie
Invictus Law
1240 Perimeter Parkway, Suite 404
Virginia Beach, VA 23454
P (757) 337-2727

I further certify that on this 12th day of January, 2023, I caused a true and correct copy of the foregoing Position of the United States with Respect to Sentencing Factors to be emailed to the following:

Joshua A. Coleman
Senior United States Probation Officer
600 Granby Street, Suite 200
Norfolk, Virginia 23510
(757) 222-7300

By: \_\_\_\_/s/_____
William B. Jackson
Assistant United States Attorney
United States Attorney's Office
World Trade Center, Suite 8000
101 W. Main Street
Norfolk, Virginia 23510
Office Number: (757) 441-6331
Facsimile Number: (757) 441-6689
william.jackson3@usdoj.gov